[No. 3072, Sept. 17, 1927.]

SLEASE et al. v. D. M. MILLER & CO.

[260 P. 408]

### SYLLABUS BY THE COURT

Ambiguous contract for sale of goods of a specified value from a larger stock, construed in light of circumstances and conduct of parties, and **held**, that the privilege given the buyer to reject unmerchantable goods gave him the free and exclusive right of selection.

---

[1] 35Cyc p. 98 n. 19; p. 229 n. 55.

Appeal from District Court, Sierra County; Owen, Judge.

Suit by Wm. D. Slease and others against D. M. Miller & Co., a copartnership composed of D. M. Miller and others for specific performance, consolidated with an action by D. M. Miller & Co. against Wm. D. Slease and others for damages. From the judgment below, D. M. Miller & Company appeals. Affirmed and remanded.

See, also, 31 N. M. 52, 240 P. 811.

James G. Fitch, of Socorro, H. A. Wolford, of Hillsboro, and D. H. Wolford, of Brawley, Cal., for appelant.

Edward D. Tittman, of, El Paso, Tex., for appellees.

OPINION OF THE COURT

WATSON, J. This litigation arises out of the following contract:

"This agreement, made the 10th day of August, 1922, between D. M. Miller & Co., of Hillsboro, N. M., by D. M. Miller, party of the first part, and Wm. D. Slease, Marie Knight, Gertrude Knight Gardner, and W. A. Gardner, parties of the second part.

"The party of the first part, for and in consideration of the sum of $3,000 (three thousand dollars) doth agree to s、ll, convey, and guarantee title of the following described real estate:

"The D. M. Miller & Co. store buildings, property with fixtures as is (with truck and truck accessories omitted) siutated in the town of Hillsboro, N. M.

"The party of the first part further agrees to sell, convey, and guarantee title thereto, to the following described stock of merchandise, at present stored in the above-described buildings.

"Stock of general merchandise as is subject to daily sales between the date of this contract and date of inventory herein after mentioned, for the consideration of seven thousand dollars ($7,000).

"Further agreed the amount of the above merchandise to be transferred shall be determined by an inventory taken jointly by the parties of the first part and the parties of the second part, said inventory to begin on or before August 22, 1922.

"All merchandise over and above the above mentioned shall be subject to the removal or disposal of the party of the first part within sixty days from completion of this contract. Value of individual articles of above merchandise shall be determined by present replacement value.

"The parties of the second part shall have the right to reject any merchandise of the above stock that they may deem unmerchantable. The above stock taken by the parties of the second part shall be subject to a 5 per cent. discount.

"The above consideration shall be paid by the surrender of two promissory notes (described as follows) made by D. M. Miller & Co. on November 17, 1919, for eight thousand dollars and made on November 17, 1920, for four thousand dollars less payments and plus unpaid interest to Wm. D. Slease.

"This agreement is subject to acception or rejection of Mrs. Gertrude Knight Gardner.

"Signed this date

"D. M. Miller & Co.,
"By D. M. Miller,
"Party of the First Part.
"Wm. D. Slease,
"Marie Knight,
"Gertrude Knight Gardner,
"W. A. Gardner,
"Parties of the Second Part.

"Witness: Minnie E. Slease.

"Witness: Fred V. Connoff.

"Any amount due parties of the second part over the above mentioned ($10,000.00) ten thousand dollars is payable at completion of this agreement by party of the first part. Cash not to exceed $200.00 balance in merchandise."

After the making of this contract, D. M. Miller and Wm. D. Slease, who acted, respectively, for themselves and their associates, on August 12, proceeded to take an inventory of the stock. During its progress, a considerable portion of it was, for one reason or another, rejected by Slease, with the consent of Miller, set apart from the rest, and not included in the inventory. For the most part, the articles which found their way into the inventory were not priced at the time; their "replacement value" being left to future determination. As to some articles, an agreement as to price was reached. Such agreed prices were carried into the inventory. During the three or four days occupied in

listing the stock, the store was, generally, open for business. The proceeds of sales made during that time were appropriated by Slease, or by Miller; by the former. if the articles sold had been listed, otherwise by the latter. When the listing was completed, Slease was left in possession of all the stock, except such as had been definitely rejected and set apart, and he continued the business.

The ascertainment of "replacement values" seems to have been left almost entirely in the hands of Miller and one Conniff, who acted for Slease. There was great delay in this work, and it was not until June, 1923, that the final figures were available. It then appeared, and is now agreed, that the total "replacement value" of the stock carried into the inventory, and delivered to Slease, with the $3,000 for real estate, buildings, and fixtures, with an agreed freight. allowance, and less the agreed discount, exceeded the amount of the note indebtedness by $4,428.11. To that extent, stock had been delivered to Slease in excess of what he had paid for, or agreed to buy, and was "subject to the removal or disposal" of Miller. During ten months this stock had been in Slease's possession and offered to the public for sale. It is this situation which has caused the controversy. The parties were unable to make division of the stock, and the courts were called upon to do so.

When the question arose, the parties disclosed widely divergent views as to the meaning of the contract and as to their rights thereunder. Miller's theory was that Slease had, during the listing of the stock, exhausted his right to reject any of it as unmerchantable; that, under the contract, and by the practical construction to be found in the conduct of the parties, the stock, in the order in which it was carried into the inventory, passed to Slease; and that, when the listing had reached the point necessary to meet the indebtedness, the sale had been accomplished, and that the stock thereafter listed did not pass to Slease, but remained his, subject to removal and disposition by him. Acting upon this theory, he prepared a deed of the real estate, buildings,

and fixtures, and a bill of sale covering specific portions of the stock which, under his theory, he claimed had passed to Slease. These documents he tendered to Slease, and demanded the right to remove the remainder of the stock. This Slease refusd.

Slease's theory was that he did not, during the listing, exhaust his right to reject unmerchantable stock, but rejected such as he was unwilling to consider at any price; that the stock not absolutely rejected was listed merely for inventory purposes, and was, after inventory, to be reduced to the correct size and amount by his cutting it back under his privilege of rejecting any of it deemed unmerchantable. Acting upon his theory, he listed stock to the amount of $3,267.80, which he offered to allow Miller to remove, and offered to pay him cash $1,160.31, thus satisfying the excess of the inventoried stock over the indebtedness. So offering, he demanded a deed of the real estate, building, and fixtures, and a bill of sale of the retained stock. This Miller refused.

Slease then commenced suit, setting up the contract, the proceedings thereunder, and his offer to Miller, and praying that the latter be required specifically to perform. Miller answered. He later instituted suit himself, setting up Slease's refusal to allow him to remove what he claimed to be his portion of the stock, relying upon that fact as a conversion, and praying for damages of $4,428.11, the agreed amount of the excess. Slease answered this complaint. These two causes were consolidated; Miller's complaint in conversion being considered as a cross-complaint.

The consolidated cause was tried to the court, who, except as to minor matters not necessary to mention, rejected Miller's findings of fact and found generally for Slease. By the judgment, Miller was required to convey the real estate, buildings, and fixtures, and also to convey the stock which had been inventoried, less that part of it cut back by Slease and included in another inventory attached to his offer to Miller; the latter inventory being reduced by certain items which

the court found to have been improperly cut back.
Slease was required to deliver to Miller the remainder
of the merchandise, and to surrender his notes, and to
pay him the sum of $1,283. The judgment is perhaps
not entirely clear, and some question is raised regard-
ing it. We cannot doubt, however, that its meaning
is as stated.

Counsel seem to agree that the written contract, am-
biguous in many respects, particularly fails to provide
for the situation which arose when it was found that
the stock was larger than necessary to satisfy the in-
debtedness. Both parties have endeavored, by evidence
of circumstances, conduct and conversations, to sus-
tain their respective views as to the understanding of
the parties when they contracted, and the practical
construction which they afterward adopted.

As to the theory upon which Miller acted, not much
need be said. His counsel have expressly abandoned it.
Requesting the trial court to find numerous specific
facts, they asked him to conclude as a matter of law that
upon the completion of the inventory, when the total
"replacement value" was finally ascertained, the par-
ties were owners in common of the stock in the propor-
tions of $7,634.69 and $4,428.11, that neither party had
the right by himself to make the division, and that
Slease's refusal to permit Miller to "participate in the
division" constituted a breach of the contract and a
conversion of Miller's share. Such is the contention
here.

The argument is that, in the absence of contract pro-
vision for division, in the event of an excess of stock
over the indebtedness, the parties became owners of
undivided interests; that, as they expressly admit,
Slease's contention that he did not exhaust his right
to reject as unmerchantable, at the time of listing, is
correct; but that the mere right to reject as unmerch-
antable did not warrant rejecting stock simply because
he did not want it, or warrant retaining more than the
amount agreed upon because he did want it, particular-
ly after he had been in possession, and had been selling

the stock for ten months, nor warrant the claim of right, without agreement with Miller, to determine upon the division. It is urged that the relations of the parties are analogous to the situation arising out of a voluntary confuson of goods; and authorities are cited to the propostion that, in such a case, the party refusing the other participation in the distribution is guilty of a conversion.

The trouble with this, as with most theories adopted after the event, is that the facts cannot be made to sustain it. Neither party so understood the contract. Miller did not demand, nor did Slease refuse him, participation in the division of common goods. He himself made a division of them, on paper, and demanded that Slease accept it. That is all that he was refused. Had it been intended to sell an undivided interest in the stock, even the inexperienced draftsmen of this contract would have been able to express the intent. It was the unusualness of the trade, and its compexity, to which their powers of expression proved unequal.

The judgment is based upon Slease's theory of the contract. Appellants attack it in two respects: First, that appellees had not the right to retain merchandise in excess of the indebtedness, even though offering to pay for it at the inventory price; and, second, that appellees had no right, after accepting the merchandise as inventoried, and after possessing it for ten months, and selling from it as their own, to reject portions of it as unmerchantable.

Counsel make much of the admitted fact that the result of this judgment is to leave in appellant's hands shelf-worn and damaged goods, as well as odd sizes and remnants, and that the stock to be returned to them is worth no more than 25 per cent. of the inventory price. But it is to be remembered that appellees were to have some $7,000 worth of goods. It would be equally a hardship to unload this undesirable merchandise upon them. It nowhere appears that the goods retained by appellees are of greater value than the inventory

prices. It is very significant that the parties seem always to have considered "replacement value" the term used in the contract, as meaning the then wholesale price of new goods of the same kind. So the merchandise was finally valued in the inventory without regard to age or condition. The stock was the accumulaton of several years. Naturally there would be numerous articles, for one reason or another, worth much less than the sum for which they could be replaced with new. Considering this fact, it does not seem so unreasonable to have agreed to leave such goods in appellants' hands. It would have been a poor bargain, indeed, had appellees agreed to take them. This lends color to the Slease contention that a real cut-back was contemplated rather than the more limited right to reject goods strictly unmerchantable. It is also to be noted that appellees did not agree to take any particular goods, and did reserve the right to reject. They were to have some choice. There is nothing to indicate that appellants were to have a voice in selecting the goods to be transferred. During the listing of the stock, Miller never questioned Slease's right to reject as he saw fit. Some of the rejected goods were no doubt merchantable, according to the definition contended for by appellants.

So, as to who had the right of selection, we are not disposed to disturb the construction which the court put upon the contract, in the light of circumstances and the conduct of the parties . Indeed, we see nothing so unreasonable or inherently improbable in such construction, as applied to the time when the parties by their contract and conduct settled their relations to the property. It is the lapse of ten months, during which appellees held the stock and sold from it, that gives the result the appearance of injustice and hardship. During that time odd sizes and remnants of course accumuated and goods became more soiled and less desirable. But the delay was probably not contemplated. Explanations appear in the evidence; but we cannot say that it was unavoidable or to have been anticipated. Miller was at least as much at fault as Slease. It would seem that, by greater diligence, the

result might have been determined much more promptly. The unfortunate consequences to appellants, the court had no power to mitigate.

Holding that appellees were within their rights in selecting the goods they were to keep, what of the contention that they wrongfully selected more than enough to satisfy the indebtedness? As an independent proposition, it is of minor importance. It is not thought that appellants were prejudiced by it. It would have been to their advantage if appellees had selected more, rather than less. If a technical conversion, the damages for it would have been the inventory price, which they offered, and are required to pay. Appellants recognize this in laying their damages for the alleged conversion. The contention could be of advantage to appellants only in case it served to put appellees in the wrong and in the position of having converted the whole of their remnant, so that they might recover $4,428.11, instead of goods worth only 25 per cent. of that sum. The contention is sufficiently answered by saying that there was substantial evidence to sustain the trial court in upholding the right. The goods were left in appellees' possession, clearly for sale. If some could be sold, all might be. In such case, the inventory price would determine what appellants were entitled to receive in lieu of the goods. There was also evidence that the parties contemplated from the first that an indebtedness to appellants might result.

Appellants have rightly stated in their brief that the case depends upon correct construction of the contract. The document itself being dubious, it was necessary to look elsewhere for its meaning. The questions presented to the trial court were mostly of fact. He could no doubt have made a better contract and perhaps devised a fairer trade. Such is not the business of the courts. We must take the contract as we find it. Practically the trial court was limited to one of the theories advanced by the parties. He could hardly take middle ground. We find appellees' theory, which the court adopted, supported by substantial evidence.

Therefore we affirm the judgment, and remand the cause for its enforcement. It is so ordered.

PARKER, C. J. and BICKLEY, J., concur.